United States District Court
District of Maine

| | |
|---|---|
| Siera L. Boucher, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. |
| | ) |
| Community Surgical Supply | ) |
| of Toms River, Inc., | ) |
| | ) |
| Defendant. | ) |

## Complaint and Demand for Jury Trial and Injunctive Relief Sought

Plaintiff Siera L. Boucher brings this civil rights action against Defendant Community Surgical Supply of Toms River, Inc. (CSS).

### Summary of Civil Rights Case for Sex Discrimination and Retaliation

1. Siera Boucher is a licensed Respiratory Therapist and a mother. In June 2019, she applied for an advertised position as a Respiratory Therapist at CSS. After two rounds of interviews, on June 24, 2019, she was offered the job. She was very excited about the opportunity and, after routine inquiries about the terms of the offer, on June 25 she accepted the job at CSS and gave notice of her resignation to her current employer.

2. On June 26, after Ms. Boucher accepted the position at CSS and gave notice, CSS Hiring Manager Marc Connolly told her for the first time that there was a mandatory week-long training in Connecticut. Because she was still breastfeeding her 10-month-old baby, Ms. Boucher inquired about possible "accommodations/adjustments" for breastfeeding mothers. She made it clear that if necessary she and her partner would make it work so she could attend the out-of-state training.

3. The next day, June 27, CSS rescinded Ms. Boucher's job offer with no explanation. In an internal email sent the day before, just three hours after Ms. Boucher first inquired about breastfeeding, CSS's Director of Operations stated that the company was rescinding Ms. Boucher's offer because "we see too many red flags" and expressly cited as a "red flag" the false allegation that Ms. Boucher had "called in to state that she could not travel out of state for training because she needed to care for her 10 month old child."

4. After conducting a thorough investigation, the Maine Human Rights Commission unanimously found reasonable grounds to believe CSS discriminated against Ms. Boucher on the basis of sex, and retaliated against her for engaging in activity protected under the Maine Human Rights Act.

## Parties

5. Plaintiff, Siera L. Boucher, is a citizen of the United States and is a resident of Readfield, County of Kennebec, Maine.

6. Defendant, Community Surgical Supply of Toms River, Inc., is a corporation doing business in Maine and organized under the laws of the State of Maine.

## Jury Trial Demand

7. Under Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

8. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and the Maine Human Rights Act, 5 M.R.S. §§ 4551 *et seq.* This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 (federal question) and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

9. Venue is proper in the District of Maine under 28 U.S.C. § 1391. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland because Defendant's place of business is in Cumberland County.

## Administrative Exhaustion

10. On November 15, 2019, Ms. Boucher filed a complaint of sex discrimination and retaliation with the Maine Human Rights Commission.

11. On November 17, 2020, the Maine Human Rights Commission unanimously adopted the October 14, 2020 Investigator's Report finding reasonable grounds to believe CSS discriminated against Ms. Boucher on the basis of sex, and retaliated against her for engaging in activity protected under the Maine Human Rights Act. *See* Exhibit A (Investigator's Report); Exhibit B (Statement of Finding).

12. On February 16, 2021, the Maine Human Rights Commission issued a failure-of-conciliation letter to Ms. Boucher.

13. On February 25, 2021, the Equal Employment Opportunity Commission issued a Notice of Right to Sue to Ms. Boucher.

14. Under 5 M.R.S. § 4622, Ms. Boucher has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

15. Ms. Boucher has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Factual Allegations

16. Siera Boucher is a licensed Respiratory Therapist and the mother of two young children.

17. In June 2019, Ms. Boucher applied for an advertised Respiratory Therapist position with CSS through Indeed.com.

18. CSS has about 650 employees and is headquartered in New Jersey. It provides customers with home-care equipment and services and has over 15 service locations in ten states, including two offices in Maine.

19. After two rounds of interviews with Hiring Manager Marc Connolly, on June 24, 2019, CSS extended a written job offer to Ms. Boucher.

20. In order to view the written offer letter, Ms. Boucher was instructed to create an account on CSS's website. When she did so, she saw a sign-on bonus advertised on the company's website for the Respiratory Therapist position.

21. The written offer letter to Ms. Boucher listed a pay rate of $31/hour. Although she and Hiring Manager Connolly had discussed a general pay range for the position, this was the first time Ms. Boucher learned what hourly pay rate CSS was offering for the position.

22. Before accepting the job offer, Ms. Boucher made routine inquiries to Human Resources Representative Nicole O'Keefe about the offer, including whether she was eligible for the advertised sign-on bonus and

whether CSS would consider a slightly higher hourly rate ($33/hour, rather than $31/hour).

23. Ms. O'Keefe conferred with Hiring Manager Marc Connolly and responded to Ms. Boucher that the bonus was not available because she had applied through Indeed.com, and that CSS was staying with the offered hourly rate initially but Ms. Boucher would be eligible for an increase after her 90-day review. Ms. Boucher also asked how many people worked in the office so she would know how often she would be on call, but did not receive a response to that inquiry.

24. Satisfied with CSS's responses to her inquiries, on June 25, Ms. Boucher accepted the job offer with CSS through her account on the company's website.

25. Ms. Boucher was very excited about the opportunity to work at CSS. Unlike most Respiratory Therapist positions, the CSS position would allow Ms. Boucher to work a regular weekday schedule, which would enable her to spend more time with her young family. The job at CSS would also afford Ms. Boucher a substantially higher pay rate than the job she held at the time.

26. That same day, June 25, Ms. Boucher gave two weeks' notice of her resignation to her current employer.

27. On the morning of June 26, after Ms. Boucher had accepted the offer and given notice to her current employer, Hiring Manager Marc Connolly told Ms. Boucher for the first time that she was required to attend a mandatory week-long, out-of-state training in Connecticut before starting the position at CSS.

28. At the time, Ms. Boucher was breastfeeding her 10-month-old baby, who did not take a bottle. As soon as she learned about the mandatory out-of-state training, she conferred with her partner. They agreed that if necessary they would figure out how to make it work for Ms. Boucher to attend the training. They discussed possible options, including her partner taking unpaid leave from his job and coming to the training with the kids so she could breastfeed the baby during the training, or her mother and the baby coming with her to the training so she could breastfeed.

29. At about 2 p.m. on June 26, Ms. Boucher emailed Human Resources Representative Nicole O'Keefe to ask about how she might be able to complete the required training while continuing the feed her baby:

> "Mark has informed me this morning that training was in CT. This is the situation I'm having. I currently breastfeed my 10 month old and he doesn't take a bottle at night. My SO [significant other] has no problem coming with me to assist with the kids while I'm at training so I don't loose my milk supply but he also just started a new job about a month

ago and doesn't have the PTO days yet. Are there any accommodations/adjustments we can make?" Ms. Boucher sent a text message to Mr. Connolly with the same question.

30. Ms. O'Keefe responded by email that Ms. Boucher should "call me to discuss."

31. Ms. Boucher spoke with Ms. O'Keefe by phone on the afternoon of June 26. Ms. Boucher asked about possible accommodations for breastfeeding mothers, given that her baby did not take a bottle and her husband had limited PTO. She told Ms. O'Keefe that if needed they would figure something out so she could attend the training, and she mentioned the possibility of her partner or mother coming to the training with her.

32. Ms. O'Keefe told Ms. Boucher she would contact Mr. Connolly to see what they could do. Ms. O'Keefe said that perhaps Ms. Boucher could attend the training by Zoom videoconference or from a different location. Ms. O'Keefe was very understanding and explained they were required to accommodate breastfeeding mothers under State law. Ms. O'Keefe said would get back to Ms. Boucher after she'd spoken with Mr. Connolly.

33. Ms. Boucher never heard back from Ms. O'Keefe.

34. Instead, at 5:04 p.m. that same day, June 26, CSS Director of Operations Eddie Ruela wrote in an email to the Indeed.com recruiter that CSS was rescinding Ms. Boucher's job offer because "we see too many red

flags." Director Ruela's email expressly cited as a "red flag" that Ms. Boucher "called in to state that she could not travel out of state for training because she needed to care for her 10 month old child." The other "red flags" cited by Director of Operations Ruela were that Ms. Boucher had inquired about the advertised bonus and the hourly pay rate and had asked about on-call responsibilities for the position.

35. When Ms. Boucher did not hear anything back from Ms. O'Keefe in response to her inquiry about breastfeeding, she emailed Ms. O'Keefe to follow up.

36. On June 27, Ms. O'Keefe informed Ms. Boucher by email that they had "decided to rescind our offer," with no further explanation.

### Legal Claims for Sex Discrimination, Retaliation, and Interference

37. Plaintiff realleges and incorporates by reference all the preceding allegations.

38. Defendant has intentionally discriminated against Ms. Boucher because of her sex, denied her reasonable accommodations for a pregnancy-related condition, retaliated against her for her protected reasonable accommodation requests, and interfered with her right to breastfeed and to work free from sex discrimination and retaliation, in violation of the Maine

9

Human Rights Act, 5 M.R.S. §§ 4551 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

39. Ms. Boucher is pursuing all possible methods of proving this discrimination and retaliation, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as causation based on a single unlawful motive and mixed motives, including an unlawful motive.

40. As a direct and proximate result of Defendant's intentional discrimination and retaliation, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of her job and of her life, injury to reputation, and other pecuniary and non-pecuniary losses. Wherefore, Plaintiff requests relief against Defendant as follows:

(a) Enter declaratory relief that Defendant violated Plaintiff's statutory civil rights to be free of sex discrimination and unlawful retaliation, and interference with her right to breastfeed;

(b) Enter injunctive relief ordering Defendant to:
- provide effective civil rights training for all human resources employees and all supervisors on the requirements of all applicable laws prohibiting employment discrimination

    because of sex and pregnancy and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

- provide this training for two years after the date judgment is entered to all new human resources and supervisory employees within 60 days of their starting work;
- maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;
- post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief;
- send a letter printed on Defendant's letterhead to all of Defendant's employees advising them of the judgment in this case, enclosing a copy of their policies regarding sex discrimination, and stating that they will not tolerate any such discrimination, and will take appropriate disciplinary action against any employee or agent of Defendant who engages in such discrimination;

    (c)    Award Plaintiff back pay for lost wages and benefits and prejudgment interest;

(d) Award Plaintiff reinstatement to Respiratory Therapist position or, in lieu thereof, front pay for future lost wages and benefits;

(e) Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(f) Award punitive damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(g) Award Plaintiff full costs and reasonable attorney's fees; and

(h) Award such further relief as is deemed appropriate.

Date: April 8, 2021                    Respectfully submitted,

/s/ Carol J. Garvan
Carol J. Garvan, Esq.
Johnson, Webbert & Garvan, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04330-0079
(207) 623-5110
E-mail: cgarvan@work.law


/s/ Valerie Z. Wicks
Valerie Z. Wicks, Esq.
Johnson, Webbert & Garvan, LLP
160 Capitol Street, P.O. Box 79
Augusta, Maine 04330-0079
(207) 623-5110
E-mail: vwicks@work.law

*Attorneys for Plaintiff*